# IN THE INTERMEDIATE COURT OF APPEALS OF WEST VIRGINIA

2023 Spring Term

_____

No. 22-ICA-54

_____

FILED

**July 28, 2023**

released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
INTERMEDIATE COURT OF APPEALS
OF WEST VIRGINIA

YMCA OF PARKERSBURG,
Appellant Below, Petitioner,

v.

WEST VIRGINIA DEPARTMENT OF HEALTH AND HUMAN RESOURCES,
Respondent Below, Respondent.

_____

Appeal from the West Virginia Department of Health and Human Resources
Board of Review
Action Nos. 22-BOR-1508, 22-BOR-1509

REVERSED

_____

Submitted: April 26, 2023
Filed: July 28, 2023

Robert L. Bays, Esq.
Bowles Rice LLP
Parkersburg, West Virginia
Counsel for Petitioner

Patrick Morrisey, Esq.
Attorney General
Grant A. Newman, Esq.
Assistant Solicitor General
Charleston, West Virginia
Counsel for Respondent

CHIEF JUDGE GREEAR delivered the Opinion of the Court.

JUDGE SCARR concurs and reserves the right to file a separate opinion.

GREEAR, Chief Judge:

Petitioner YMCA of Parkersburg ("YMCA") appeals the August 3, 2022, order of the West Virginia Department of Health and Human Resources Board of Review ("the BOR") affirming the decision of the West Virginia Department of Health and Human Resources ("DHHR") to issue first strikes to YMCA's Parkersburg and Williamstown facilities under the West Virginia child care subsidy ("state subsidy") program. The first strikes were issued due to YMCA's alleged improper termination of child care services to two children enrolled at its facilities (one at YMCA's Parkersburg facility and one at YMCA's Williamstown facility).

YMCA argues that the first strikes at issue were not warranted as YMCA did not improperly terminate child care services for the named children. YMCA highlighted the importance of the issuance of these first strikes against its facilities, as the mere issuance of the first strikes discontinued payments, totaling approximately $250,000, that YMCA was otherwise qualified to receive under a federal stabilization program known as the American Rescue Plan Act of 2021, 42 U.S.C. §9858 ("federal stabilization program").

Based upon our review of the record and applicable law, we find that the BOR erred in affirming DHHR's issuance of first strikes against YMCA, as child care services for the children at issue were not improperly terminated. Accordingly, we reverse the BOR's August 3, 2022, order.

1

## I. Background

This appeal involves two child care facilities operated by YMCA, one located in Parkersburg, West Virginia (22-BOR-1508) and one in Williamstown, West Virginia (22-BOR-1509). Both facilities received payments under two separate programs, a state subsidy program to financially assist qualified families with child care costs, and a temporary federal grant program intended to stabilize the child care industry during the Covid-19 pandemic. While the issuance of the first strikes had no effect on YMCA's receipt of state subsidy payments, the strikes were determined by the federal stabilization program representatives to classify YMCA as "not in good standing" under the state subsidy program and, therefore, render YMCA ineligible to receive the federal stabilization program payments for a period of one year.

### A. Subsidy Program

Pursuant to the state subsidy program, each YMCA facility separately executed a provider service agreement ("PSA") with DHHR. The PSA is an agreement between YMCA and DHHR that governs YMCA's receipt of state subsidy payments for child care services it provides to eligible children under its care. Each PSA explicitly provides that "[u]nless an emergency occurs, provider agrees to give two-week termination notice to parents of children in care." Notice is not required, however, if a child is merely suspended. The PSA does not define "suspensions" or "terminations," or specify how long a suspension may last.

Subsidy payments received pursuant to the PSAs are governed by DHHR's Child Care Subsidy Policy, Section 8.8.2 of which contains a "three-strike rule" for provider violations, including violations of the PSA. Significant to this appeal, Section 8.8.1B provides, in pertinent part, that "[t]he first time a provider violates the service agreement, the case manager should notify the provider of the breach and remind the provider of the terms of the service agreement. A corrective action plan ("CAP") is not done for the first occurrence." A first strike is simply a "warning" and does not result in the loss of any payments under the state subsidy program. State subsidy payments pursuant to PSAs are supervised by Choices Child Care Resource & Referral ("Choices"), a community service organization that determines eligibility for government subsidized child care, among other functions. Both YMCA facilities in this case continued to receive state subsidy payments after their first strikes were issued.

The PSAs for YMCA facilities involved in this appeal are substantively identical and require that YMCA "have a written policy on reasons for termination and expulsion, and this policy must be provided to parents upon enrollment and at any time the policy is revised." The parents of both of the children allegedly expelled by YMCA in the underlying cases signed agreements with YMCA stating, in part, that they understood that their "child may be suspended or terminated from the program for inappropriate behavior of the child/parent and failure to observe licensing or program policies."

3

*B. Stabilization Program*

In addition to state subsidy payments, YMCA received federal stabilization payments from DHHR. These federal stabilization payments were supervised by the Division of Early Care and Education ("ECE"), a division of DHHR. Funding for the federal stabilization payments came from a federal Covid-19 grant under the American Rescue Plan Act of 2021, a program created, in part, to provide grants to help child care providers cover their operating costs for a limited period of time[1] as they faced higher expenses and lower revenues during the Covid-19 pandemic. Stabilization grant payments under the American Rescue Act are governed by the West Virginia Child Care Stabilization Payment Policy ("Stabilization Policy").

Regarding eligibility, the Stabilization Policy Section 2.2.4 expressly states that one prerequisite for eligibility is that a provider must, "[h]ave a [PSA] in good standing." The Stabilization Policy further provides under section 2.3, that if a provider is "in violation of any section of the [PSA]," the provider is ineligible to receive stabilization

---

[1] According to Section 4.1 of DHHR's Stabilization Manual, monthly stabilization payments would begin on October 1, 2021, and continue through December 31, 2023. Denise Richmond, a Child Care Policy Specialist with the ECE, testified at the hearing held on June 30, 2022, that DHHR planned to disburse funds until the money was exhausted, and considered September 2023 "as a possible end date."

payments. What it means to be "in good standing" or "in violation of" a PSA is not explained in the Stabilization Policy.[2]

The Stabilization Policy sets forth a tiered payment system based upon the type of provider receiving stabilization payments. In this case, YMCA's Williamstown facility was classified as a Type 1 Child Care Center (serving thirty or fewer children) receiving Quality Tier II payments of $10,000 per month. YMCA's Parkersburg facility was classified as a Type 3 Child Care Center (serving sixty-one or more children) receiving Quality Tier I payments of $11,000 per month. Testimony before the BOR indicated that the twelve-month suspension of stabilization payments for the Parkersburg and Williamstown facilities resulted in a combined loss of approximately $252,000 ($21,000 monthly over 12 months) in funding for YMCA.

---

[2] In order to obtain federal stabilization payments, child care providers must complete an additional form called the West Virginia Child Care Stabilization Payment Certification Agreement. This form does not use the terms "in good standing" or "in violation." Instead, the applicant is simply required to acknowledge, among other things, that he or she "must abide by my Provider Services Agreement and maintain compliance with licensing and regulatory requirements." *See* Exhibit 2 to Petitioner's Brief.

## C. *Parkersburg Child Care Center 22-BOR-1508*

L.W.,[3] is a four-year-old boy who attended YMCA's Parkersburg Child Care Center in early 2022.[4] An e-mail between L.W.'s mother and Choices representatives notes that L.W. was being evaluated for autism, ADHD, and defiance disorder. According to a YMCA behavioral report dated March 2, 2022, L.W. behaved inappropriately by hitting, kicking, and pushing another child, as well as pushing objects. It was also noted that L.W. pinched another child under the eye, leaving a welt and a bruise. The behavioral report further indicated that it was L.W.'s second offense notice, with a note that a "third write up would normally lead to expulsion but we will work with Choices . . . so we can help [the child] stay in care."

Six days later, on March 8, 2022, another behavioral report was issued for L.W.,[5] with boxes checked for the following "inappropriate behavior:" "hit a child," "kicked a child," "pushed a child," "hit a teacher," "throwing," "kicking objects," and "pushing objects." Notes on the March 8, 2022, behavioral report reflect that L.W. caused

---

[3] Consistent with our usual practice, we use initials to protect the identity of minors. *See* W. Va. R. App. P. 40(e); *State v. Edward Charles L.*, 183 W. Va. 641, 645 n.1, 398 S.E.2d 123, 127 n. 1 (1990).

[4] The interruption in child care service related to the Parkersburg facility occurred after the interruption in service related to the Williamstown After School program. The Parkersburg matter was assigned an earlier case number because it was reported first.

[5] This behavioral report does not have a check mark to indicate which offense notice it represented, but presumably it was for a third offense notice because the previous report on March 2, 2022, was a second offense notice.

another child to bleed when he scratched the other child's face, and that L.W. had bruised another child by tackling the child. L.W.'s mother was called to pick up L.W. after the March 8, 2022, offense and was provided a copy of the behavioral report. This report was signed by L.W.'s mother, and an employee of YMCA, and specifically stated that L.W. could "return on . . . [March 17, 2022] . . . when [the] behavior specialist returns." L.W. did not return on March 17, 2022. Katie Flinn, the child care director for the Parkersburg YMCA, testified that she spoke with L.W.'s mother when he was suspended on March 8, and that she had subsequently tried to contact L.W.'s mother when he did not return on March 17, but the mother did not get back in touch with her.

Sometime after March 8, 2022, L.W.'s parent e-mailed DHHR and stated that the Parkersburg YMCA Director "called and notified [her] that 'they tried, and they cannot do it anymore'… and 'they cannot handle it anymore as [L.W.] is requiring too much and they don't have staffing for it.'" On March 25, 2022, without conducting any investigation, and without contacting YMCA, DHHR issued a first strike against the Parkersburg YMCA under the state subsidy policy, citing it for expelling a child without a two week notice of termination to the parents.[6]

---

[6] After this first strike was issued, Jennifer Negie, a behavioral consultant for Choices, contacted L.W.'s mother to see if she needed help finding another child care provider. According to an April 22, 2022, e-mail from Ms. Negie, when she called L.W.'s mother, Ms. Negie stated that L.W. had been suspended until March 17, 2022, and the mother replied that "they had given her a paper saying that he couldn't return." If such a paper existed, there is no indication that DHHR ever tried to obtain a copy, and it was not submitted into evidence here or below. In another post-first strike e-mail, L.W.'s mother

The first strike issued to Parkersburg YMCA as a result of the alleged termination of child care services to L.W. was titled "notice of provider approval status," ("notice") and noted that expulsion of a child from the child care program, without a two-week notice to the parent, constitutes a violation of YMCA's PSA. However, this violation imposed no sanction, nor did it withdraw state subsidy payments. In the notice, YMCA was informed that a second strike would result in an "individual training session" and the development of a "corrective action plan." Further, in the event of other violations, YMCA was advised that the PSA may be terminated, in which case, YMCA "will no longer be eligible to accept subsidized child care payment[s]." YMCA's Parkersburg program continued to receive subsidy payments after it received its first strike.

As a result of this first strike, ECE determined that YMCA's Parkersburg facility was not eligible for federal stabilization payments for twelve months.[7] Ironically, in a case where YMCA lost approximately $250,000 in federal stabilization payments because it did not provide notice to parents of an alleged termination of child care services,

---

appeared to admit that her son had been suspended and could return to YMCA child care. In an April 22, 2022, e-mail from L.W.'s mother to Choices, the mother stated, in part, that: "[a]t the set of write-ups resulting in the five-day suspension, I had asked the child care director if they could request the Choices provided therapist to come and watch him, as I was going to bring him to his pediatrician about these behaviors. They complied. Once he returned, they continued to call daily…"

[7] The record does not indicate why federal stabilization payments were suspended for twelve months when such payments are billed and processed on a monthly basis. Nor is there any reference to a statute, regulation, or even a written policy mandating a twelve month suspension.

DHHR did not provide notice to YMCA that its stabilization payments were being suspended for a year. As the BOR noted in its August 3, 2022, decision: "[t]he [DHHR] did not provide evidence that its secondary [action] to terminate stabilization grant payments were properly notified, so it is more likely than not that these notices were not sent. The [DHHR] failed to provide the [YMCA] adequate 13-day notice of an adverse action."[8]

## D. *Williamstown After School Program 22-BOR-1509*

The second matter involves L.G., a six-year-old boy who attended YMCA's After School Program in Williamstown, West Virginia. L.G. suffers from PTSD and is in foster care. On February 14, 2022, a YMCA behavioral report was issued for L.G. with boxes checked for the following "inappropriate behavior:" "hit a child," "kicked a child," "spit on a child," "pushed a child," "screaming," "hit a teacher," "kicked a teacher," "spit on both teachers," "pushed both teachers," "throwing," "kicking objects," "spit on objects," and "pushing objects." Notes in the behavioral report state that L.G. "thr[ew] people's valentine's bags on the floor, punched another student, r[an] away from teachers, tried to smack students, slapped both teachers multiple times, [and] continuously spit on both teachers." The foster parent was called to pick up L.G. The behavioral report, which was

---

[8] This statement by the BOR refers to Section 11.2 of the Child Care Subsidy Policy & Procedures Manual which provides that: "[a]dequate notice of a decision affecting benefits shall be mailed or provided in writing in a face-to-face contact, to the applicant. Notice shall be mailed at least thirteen (13) days before the effective date of any action or decision which may be adverse to the applicant."

signed by L.G.'s foster parent and a YMCA representative, indicates that this was a first offense notice. The behavioral report did not indicate when or if L.G. could return to the Williamstown YMCA, but the BOR determined that "Ms. Flinn [a YMCA employee] called the foster parent of [L.G.] on February 14, 2022, to advise the foster parent that [L.G.] could return to care on February 28, 2022." *See* the BOR's August 3, 2022, order. At the hearing below, Jeff Olson, the president and chief executive officer of YMCA, testified that he also spoke with L.G.'s foster parent, and told her that L.G. would be suspended, but could return the following week. Mr. Olson reported that L.G.'s foster parent appreciated that L.G. would be suspended instead of expelled.

On April 5, 2022, L.G.'s foster parent called DHHR and reported that L.G. had been "expelled from the [YMCA's Williamstown] site," but that her other child was still attending the program. Also on April 5, 2022, without conducting an investigation and without contacting YMCA, DHHR issued a first strike against the Williamstown After School program, citing it for expelling L.G. without a two-week notice of termination to the parents.[9] This warning, like the one previously sent to YMCA regarding its Parkersburg facility, was styled a "Notice of Provider Approval Status," and stated that expulsion without a two-week notice to the parent constituted a violation of YMCA's PSA but one which imposed no sanction and did not suspend subsidy payments. YMCA was also

---

[9] As discussed more fully below, the record reflects that neither Choices nor the ECE, made any effort to contact YMCA to inform it of the complaints levied by L.W. and L.G.'s parents or give YMCA an opportunity to respond before its federal stabilization payments were suspended.

warned that a second violation would result in an "individual training session" and the development of a "Corrective Action Plan." In the event of further violations, the PSA might be terminated, in which case, YMCA would "no longer be eligible to accept subsidized [child care] payments." Again, absolutely no mention is made in this form notice of the effect that a first strike would have on YMCA's eligibility for federal grant stabilization payments. YMCA's Williamstown program continued to receive subsidy payments after it received its first strike.

Nonetheless, as a result of this first strike under the state subsidy program for an alleged violation of its PSA, DHHR determined that YMCA's facility in Williamstown was not eligible to receive stabilization payments for twelve months. There is no evidence in the record that DHHR ever provided a written notification to YMCA that its stabilization benefits were being suspended. Further, the BOR concluded that the requisite thirteen-day notice of an adverse action was never sent to YMCA.

### E. The BOR's Decision

The individual underlying matters were consolidated for hearing and decision below, with DHHR having the burden of proving its case by a preponderance of the evidence.[10] In its August 3, 2022, decision, the BOR recognized that YMCA's appeal essentially turned on the determination of whether YMCA's actions constituted terminations of services without notice in violation of its PSAs, or if child care services were merely suspended. The BOR found that DHHR's policy does not define what period of time represents a mere suspension of services and what period of time is to be treated as a termination of services. However, the BOR reasoned that YMCA's internal suspension policy was sufficient to determine how YMCA's actions should be defined, and that YMCA did not adhere to that policy in these two matters.

As to L.W., he received his third offense behavioral report on March 8, 2022, and was suspended until March 17, 2022. The BOR found that this suspension exceeded the limits of YMCA's policy because uncontroverted testimony indicated that a third offense violation called for a one-week suspension. According to the BOR, the interruption in L.W.'s service lasted nine days.

---

[10] *See* Section 11.6.4 of the Child Care Subsidy Policy & Procedures Manual stating in part that "[t]he case manager will present to the hearings officer first, as the agency bears the burden of proof for the action taken…." Counsel for DHHR acknowledged during oral argument before this Court that DHHR had the burden of proving by a preponderance of evidence that terminations, rather than suspensions, occurred.

As for L.G., the BOR found that his behavioral report on February 14, 2022, was identified by the facility as a first offense violation. Thus, per YMCA policy, this suspension should have only been for one day. Although the behavioral report did not have a return date, the foster parent was verbally informed as to when her child could return. According to the BOR, testimony at the hearing established that L.G. was permitted to return to the Williamstown After School program on February 28, 2022. The BOR found that this period was too long under YMCA's internal policy, and therefore concluded that such constituted an unnoticed termination.

The BOR further concluded that the parents of the children subject to YMCA discipline were under the "impression" that their respective children were expelled due to poor communication with YMCA representatives, which led to the BOR determining that YMCA's actions constituted terminations, rather than suspensions. Because neither YMCA facility argued that the offending children's behaviors constituted an "emergency," which could have arguably been an exception to the requirement for two weeks' notice before expelling a child, the BOR determined that both YMCA facilities had violated their respective PSAs with respect to the notices required for termination.

On August 3, 2022, the BOR issued its order affirming DHHR's decision to issue first strikes to YMCA under the state subsidy program, thus suspending its federal stabilization payments. It is from the BOR's August 3, 2022, order that YMCA now appeals.

## II. Standard of Review

Our standard of review is set forth in West Virginia Code § 29A-5-4(g) (2021), in part, as follows:

> The court may affirm the order or decision of the agency or remand the case for further proceedings. It shall reverse, vacate, or modify the order or decision of the agency if the substantial rights of the petitioner or petitioners have been prejudiced because the administrative findings, inferences, conclusions, decision, or order are:
> (1) In violation of constitutional or statutory provisions;
> (2) In excess of the statutory authority or jurisdiction of the agency;
> (3) Made upon unlawful procedures;
> (4) Affected by other error of law;
> (5) Clearly wrong in view of the reliable, probative, and substantial evidence on the whole record; or
> (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion.

"The 'clearly wrong' and the 'arbitrary and capricious' standards of review are deferential ones which presume the agency's actions are valid as long as the decision is supported by substantial evidence or by a rational basis." Syl. Pt. 3, *In re Queen*, 196 W. Va. 442, 473 S.E.2d 483 (1996). Although findings and decisions are entitled to considerable deference, reviewing courts are not required to "rubber stamp" agency determinations, "even when credibility assessments are at issue." *Id*. at 447, 473 S.E.2d at 488. In reviewing agency decisions, courts must determine not just whether the decision is supported by "substantial evidence," but "whether its findings and conclusions were adequately explained." *Id*. at 446, 473 S.E.2d at 487. A reviewing court may reverse a decision by an agency if the agency entirely fails "to consider an important aspect of the

14

problem[.]" *Id*. at Syl. Pt. 2 (in part). With these standards in mind, we now turn to the case at hand.

## III.  Discussion

On appeal, YMCA asserts three assignments of error. First, YMCA argues that the BOR's decision is against the clear weight of the evidence. Second, YMCA contends that DHHR's suspension of stabilization payments for a first strike was contrary to law and its statutory authority. Lastly, YMCA alleges that the suspension of federal stabilization grant payments constitutes the imposition of an unauthorized fine or penalty, and even if otherwise lawful, would have been excessive.

### A.  *Clearly Wrong, Contrary to the Weight of the Evidence, Arbitrary, and Capricious*

As to its first assignment of error, YMCA asserts that the BOR's decision was clearly wrong, against the weight of the evidence, arbitrary, and capricious. In its August 3, 2022, order, the BOR placed great weight on the "understanding" and "impressions" of the parents as to whether their children had been suspended or terminated. Although the subjective understandings of the parents are certainly worthy of consideration, those subjective impressions are not controlling, particularly when the record is replete with unrefuted evidence that the parents were specifically advised by YMCA, either verbally and/or in writing, that their children could return to YMCA's child care program on a future date certain.

15

In the case of L.G., there was testimony by Jeff Olson, the president and chief executive officer of YMCA, that he called the parent and was informed that L.G.'s medication had been changed, and that he "had not leveled off yet." After verifying that L.G's medication had been changed, Mr. Olson called the parent back to say that YMCA would "suspend him for the remainder of the week and the following week, and . . . invited him to come back, and that hopefully at that point in time, his medication would have a chance to level out and his behavior would return to the way it was . . . ." According to Mr. Olson, the parent "was appreciative that we weren't going to pursue termination . . . and she agreed with suspension at that point in time." This testimony by Mr. Olson was not discussed by the BOR in its order, nor did the BOR indicate any reason to discount the testimony of Mr. Olson on this issue.[11] Although we do not expect the BOR to discuss every bit of evidence proffered, we find this to be a significant omission.

We further note that YMCA introduced in evidence its active roster which still listed L.G. and L.W. to show that they had been suspended, rather than terminated. Katie Flinn, Parkersburg YMCA's child care director, testified that if the children had been expelled, rather than suspended, they would have been removed from the active roster. The

---

[11] In its order, the BOR did not give any weight to Mr. Olson's testimony about what it meant when a child was listed on the active roster, because Mr. Olson was not knowledgeable on that subject and did not have the document in front of him to review. Otherwise, the BOR made no comments or findings concerning Mr. Olson's credibility or lack thereof.

BOR dismissed Ms. Flinn's testimony, however, because she had never dismissed a child until a few days before the hearing, and "[h]er testimony regarding what these rosters would show after a termination is therefore unconvincing." The BOR also stated that even with better testimony by YMCA employees, "these rosters could only show what the [YMCA] intended to communicate about its interruptions in care for the children in question, and not **the impression they created with the parents**."[12] (Emphasis added). Although Ms. Flinn may have had limited experience with terminating child care services, that does not mean that YMCA did not have a policy with regard to terminations, or that she would not have been familiar with such policy. Moreover, the BOR did not discuss whether the parents' alleged understandings and impressions were reasonable, particularly given the written and oral statements by YMCA that their children could return at specified dates.[13]

---

[12] Although the BOR seemingly placed great weight on the understandings and impressions of the parents, it apparently gave little or no weight to the intentions or understandings of YMCA, whose personnel testified and rationally explained YMCA's behavioral reports and suspensions of the offending children.

[13] This would be especially relevant in the L.W. matter where there was a behavioral report, signed by the parent, with a stated date when the child could return. It is difficult to see how this documentary evidence (authenticity and genuineness were never questioned), could be overcome. At the very least, we believe that the BOR should have included a discussion of the relevant weight to be accorded the documentary evidence compared to the unsworn hearsay of the parents within its August 3, 2022, order. The record reflects that the parents were not present and did not testify at the hearing before the BOR below; accordingly, YMCA was not afforded the opportunity to cross-examine the parents related to their statements to DHHR and was not able to pointedly address the parents' alleged perception of termination of child care services as opposed to suspension.

In its order, the BOR relies heavily on the fact that the children in these matters were suspended for somewhat longer periods than YMCA's policy typically dictates.[14] Although the duration of the suspensions may have been a deviation from YMCA's usual policy, that does not mean that the suspensions constituted, or were intended to be, terminations.

In addition to noting that the interruptions in child care services for the offending children herein were longer than contemplated by YMCA's policy, the BOR justified its decision, in part, by stating that YMCA could have implemented a policy to use written notices for all interruptions in child care service, including suspensions, so as to reduce the risk of misunderstandings by parents. Such a system was not required by YMCA's PSAs or DHHR's written policies. Further, with respect to L.W., the BOR does not explain why the behavioral report of March 8, 2022, with its return date of March 17, 2022, which was received and signed by the parent, was inadequate.

Here, this issue comes down to weighing the subjective impressions of the parents, who were not present to testify and be cross-examined at the hearing before the BOR, against documentary evidence in the form of the behavioral reports (signed by the parents involved) and YMCA's active rosters, as well as the sworn testimony of YMCA

---

[14] The BOR's second conclusion of law in its August 3, 2022, order states: "[b]ecause the [YMCA] implemented interruptions in care to the parents of Child L.G. and Child L.W. which do not match the [YMCA's] stated suspension policy, the actions cannot be suspensions from the perspective of the [YMCA]."

representatives. Other than the impressions of the parents, the only evidence presented by DHHR in support of its actions was the fact that it was not billed for child care services while the services for each of these children was interrupted. However, the fact that YMCA did not bill for services for the children does not establish that the children were expelled.[15] YMCA did not bill for children if they did not show up and receive child care services. If children were suspended, instead of being expelled, the children would continue to show up on the active roster, but not the monthly billing statements.

Accordingly, we agree with YMCA and find that the BOR's August 3, 2022, decision was clearly wrong, against the clear weight of the evidence, arbitrary, and capricious. The record clearly and undisputedly reflects that the suspension of child care services to L.G. and L.W. were suspensions as opposed to termination of child care services. The length of the suspensions for the children at issue herein was not decided by a formula or set number of days, but was based, as it should be, upon the individual needs of the child and YMCA's ability to meet those needs on a set date certain (i.e., the return of a behavioral specialist from vacation or passage of time to allow effects of medicine to reflect in the behavior of the child). As the issue in YMCA's first assignment of error is

---

[15] There are many reasons why a child on the active roster might not be on the monthly billing statement, including suspension, termination, sickness, vacation, or family situations. As Mr. Olson testified at the hearing below, "roughly 40% of the students we serve through all our youth development programs rely on state assistance, and we see them come in and out of the program frequently, depending on their home situation."

dispositive of the matter before us, we need not address YMCA's second and third assignments of error herein.[16]

## IV. Conclusion

Based on the foregoing, we find that the BOR erred in holding that the interruptions in child care services to L.W. and L.G. constituted terminations of child care services rather than suspensions. This finding was clearly wrong, against the weight of the evidence, and arbitrary and capricious. Accordingly, we reverse the BOR's August 3, 2022, order.

Reversed.

---

[16] During oral argument and in references within its brief filed in this matter, YMCA suggests that it did not receive adequate notice of the suspension of its federal stabilization program payments, which was a violation of due process. While we concur that the record herein reflects possible due process violations, we decline to address this issue herein as this issue was not substantively briefed or argued by the parties and is not necessary, as the first assignment of error is dispositive.